**TRANSOIL (JERSEY) LTD., Plaintiff,**

v.

**ANSCHUTZ PETROLEUM
MARKETING CORP.,
Defendant.**

**No. 83 Civ. 7667 LBS.**

United States District Court,
S.D. New York.

Sept. 17, 1985.

White & Case (Margaret Murphy, Alice Jump, New York City, of counsel), for plaintiff.

Milgrim Thomajan Jacobs & Lee (Leo Kailas, New York City, of counsel), for defendant.

SAND, District Judge.

This breach of contract action has been brought by one trader in the oil spot market against another such trader (the defendant Anschutz ceased its oil trading operation in January 1985) and has been tried to the court and the following constitutes our findings of fact and conclusions of law pursuant to FRCP 52(a).

### FACTS

(a) The parties.

Plaintiff Transoil (Jersey) Ltd., (hereafter Transoil), is a corporation formed under the laws of the Jersey Channel Islands with offices in Madrid, Miami and elsewhere. Defendant Anschutz Petroleum Marketing Corporation, (hereafter Anschutz), a Delaware corporation, at all times relevant to this dispute had its principal office in New York and a branch office in London.

(b) The oil.

The transaction in dispute involved an aborted sale of No. 6 fuel oil by Transoil to Anschutz. On October 9, 1981, Transoil's marketing director in charge of oil trading, Carlos Gamboa, purchased approximately 50,000 to 60,000 metric tons of No. 6 fuel oil from another oil trading company, Vitol Trading SA, Inc. The No. 6 fuel oil was to be delivered to Transoil from Pajarito, Mexico, on board the vessel Polysunrise. Loading of the No. 6 fuel oil began in Pajarito on October 18, 1981 and was completed on October 3. Gamboa during this period of time tried unsuccessfully to resell the oil in its existent condition and had advised Vitol that upon completion of loading the vessel should be instructed to proceed to Freeport, Bahamas, to await further sailing orders.

No. 6 fuel oil of Mexican origin typically is more viscous than other fuel oils. In

order to lower the viscosity of the cargo and thereby improve its marketability Gamboa decided to blend the fuel oil with number two fuel oil (also known as gas oil) in Freeport.

The resulting product it was anticipated would have met the requirements for European bunker fuel C.

On October 22, 1981, having received preliminary specifications of the Polysunrise cargo, and not having found a purchaser for that cargo in its existing state, Gamboa by telex instructed the Polysunrise to proceed to Freeport to top off the No. 6 fuel oil with approximately five percent gas oil. In his telex instructions Gamboa advised (Exhibit 4):

"Such gas oil to be evenly spread throughout loaded cargo tanks with the assistance of independent inspector Saybolt. Ideally this blending to be made in an empty tank where simultaneously fuel oil on board will be blended proportionately 95/5 with gas oil being loaded from shore then recirculated to cargo tanks."

A responding telex from Vitol stated:

"Owners will request the master to use his best efforts to have such five percent gas oil evenly spread throughout loaded cargo tanks. However, neither owner nor Vitol cannot (sic) take responsibility for proper blending of the cargo by such spreading as this is not provided for in the C/P (charterparty) nor in our sales/purchase contract." (Exhibit T.)

Thus, what was contemplated was an "on board" blend. When two fuels of different viscosity are to be blended two procedures are possible. One procedure, more expensive and time consuming, is to discharge the cargo on board to shore storage tanks, blend the two oils in shore storage tanks by use of mixers in such tanks, then reload the blended fuel aboard the same vessel. Although this entails time and effort, and consequently expense, it is a procedure which has certain advantages in measuring the blended product or assuring homogeneity of the blended oil and enabling issuance of a single set of documents attesting to the quantity and quality of the reloaded product. When an on shore blend is done, no distinction is made in the documentation of the resulting product between a shore blend and unblended cargo according to the witness Vernon (TR 346). Adequate and marketable documentation is of particular importance to spot oil traders since ownership of the cargo may change hands several times on the strength of the documentation and without inspection while a vessel loaded with a cargo is in transit.

The second procedure: An on board blend obviates the need to discharge the already loaded cargo. The master of the vessel is instructed to spread the loaded cargo evenly throughout the ship tanks. The quality of the fuel oil on board is analyzed and the amount of gas oil needed to bring the fuel oil to the desired viscosity is calculated by means of a chart.

Next a "hand blend" would be performed in a laboratory, i.e., a sample of the fuel oil and the estimated percentage of gas oil would be blended to confirm that the contemplated mixture would result in the desired viscosity. Following the hand blend, proportionate amounts of gas oil would then be loaded on to the ship on a tank by tank basis. The gas oil would be loaded into the bottom of each tank and would rise through the heavier fuel in a natural blending process which would take approximately 22 to 24 hours to complete. To further assure mixing and homogeneity, the cargo would be circulated throughout the tanks of the ship. Transoil would generally do this for its on board blend for 48 hours after sailing and before discharge. These steps, plus the movement of a vessel while in transit, are the procedures intended to utilize the vessel itself as the blending mechanism.

The parties are not in agreement as to how prevalent the practice of "on board" blending is in the industry. One Transoil executive testified that the procedure was used in 30 to 35 percent of Transoil's business. (Bent TR 33 & 40) While Carlos Gamboa estimated the percentage as 10 percent. (Gamboa TR 100) However, the

broker who conducted the negotiations leading up to the sale in question, William Vernon, whose understanding of the process is of prime importance, since he functioned as the sole intermediary between the parties during the contract negotiations, testified that he had never been involved in an on board blend transaction. (Vernon 356, 357)

The two Anschutz employees, Egan and Anderson, also testified that despite years of experience in the industry they had never been involved in such a transaction (Anderson 403, Egan 492).

One ex-Saybolt inspector, Dowse, testified that his office handled approximately 600 cargoes per year of which no more than three or four were blended and of these about two per year involved an on board blend (TR 520).

Robert Lewis, a Saybolt inspector at Freeport for six years, testified that he could recall only four or five occasions when an on board blend had been done. Regardless of the precise percentages, suffice it to say that an on board blend, though known to the industry, was the exceptional procedure not normally contemplated in an oil trade.

(c) The Negotiations

On Friday October 23, 1981, the day the Polysunrise left Mexico for Freeport, an oil broker, William Vernon, who does business as Vernon Petroleum, Inc. ("VPI") and has been in the oil business for almost 30 years telephoned Gamboa to see if Transoil had any oil to sell. Vernon testified that this conversation was the first occasion on which he learned of this oil, although it was Carlos Gamboa's recollection that he had offered the cargo previously to Vernon either as is or as a blended fuel oil and that he had told Vernon that the blend would be done on board. (Vernon TR 119) Gamboa's recollection as to this appears faulty. His contemporaneous notes have not been retained and I do not understand plaintiff to be relying on any alleged discussions between Vernon and Gamboa prior to October 23. (Plaintiff's proposed findings of fact paragraph 17 et seq.)

Both parties are agreed, however, that on Friday, October 23, Gamboa and Vernon spoke, after which conversation Vernon "took the cargo to the marketplace" by telephone inquiries to potential buyers. One telephone call Vernon made was to Edmund Egan who had joined Anschutz a few months earlier as an oil broker and who Vernon knew from the time when they both had been employed by New England Petroleum Company. Vernon told Egan that there was a cargo available in the Caribbean of high sulphur No. 6 fuel oil. After conferring with Anschutz' London office, Egan called Vernon back and advised that Anschutz was interested in acquiring a cargo meeting typical Bunker C quality specifications and negotiations commenced between Transoil and Anschutz conducted entirely through Vernon. Vernon described the specifications of the cargo including maximum viscosity of 3,500 degrees Redwood (a standard industry measurement of viscosity; the only specification at issue in this litigation).

Egan, Vernon and Gamboa took contemporaneous notes of their several conversations, but Vernon and Gamboa discarded their notes. Subsequent to the controversy having developed, Vernon prepared a note to the file, Exhibit AX, on October 31, 1981. This note explicitly states that it was being prepared "in view of the termination of this transaction ..." The most seriously disputed factual issue at trial was the extent, if at all, that Vernon disclosed to Egan that the specifications being discussed were the contemplated end result of an on board blend. Gamboa testified that he told Vernon on the afternoon of October 23, 1981 that the product Transoil was selling was a two-port load, i.e., Pajarito and Freeport, and an on board blend. Vernon testified that he immediately passed on to Egan all of the information he received from Gamboa. Vernon testified that the plan to load at Freeport and conduct an on board blend was not disclosed to Egan until late in the conversation, possibly even after the oil agreement was reached. (Vernon 354–5,

357) It appears that the last item open in the discussions related to price.

Vernon further testified that it was his understanding, based on the conversations of October 23, that a certificate of quality, based upon shore tank measurements, was going to be issued by the independent inspector at Freeport (Vernon 359 and 360) and that the independent inspector at Freeport would also be "certifying that the cargo on board the ship conformed to the specifications". (Vernon 362)

Egan's contemporaneous notes, which are Exhibit N, contain various specifications, reference to the loading port of Pajarito, the price of $176, the terms to be CIF, that for tariff purposes the cargo "must be EEC qualified" and various discharge port options available to Anschutz. There is no reference in the notes to Freeport or to an on board blend.

In his October 31 note to the file Vernon wrote that on Monday, October 26, 1981, Egan telephoned with questions concerning the transaction and that he, Vernon, had asked why the questions being raised as to blending had not been raised on the previous Friday, prior to the sending out of the telex confirming the deal. Vernon's note states: "Mr. Egan stated that VPI had represented this cargo as a blended cargo, but he had assumed the blending was to be done in Mexico. I stated that I thought I had indicated the blending was to take place in the Caribbean, since I did not know where the blend was to take place. Mr. Egan stated that the first time he knew that the blending was to take place in Freeport was when he asked the position of the ships on Friday. I indicated that this was the time that he should have questioned the blending method if he had a problem with it. Mr. Egan said that there was nobody around to check with or he probably would have questioned the blending method."

In several respects this memorandum differs from the trial testimony of both Vernon and Egan. What does seem clear, however, is that Egan's notes do not reflect the totality of his October 23rd conversations with Vernon and that the parties are in sharp disagreement as to what was said and when it was said. Around 4:30 p.m. on October 23, 1981, the parties believed that an oral agreement had been reached and at 6:08 p.m. Vernon sent to Anschutz, with copies to Transoil, a confirmatory telex, Exhibit 9, which we append as Appendix A to this opinion.

The Vernon Telex of October 23

The Vernon telex is set forth as indicated in Appendix A here to. Most of the legal issues in this case revolve around that telex, i.e., whether it manifests a meeting of the minds, whether it satisfies the statute of frauds requirement embodied in UCC Section 2–201 (the parties have stipulated that the UCC and New York Law controls this litigation) whether Transoil was ready, willing and able to perform pursuant to the terms of the telex at the time of Anschutz' alleged anticipatory repudiation. Before addressing these issues, however, the post-telex conduct of the parties is relevant.

Post Telex Events

Egan had left the Anschutz office for the weekend prior to the arrival of the Vernon telex but Anderson, the Anschutz executive in charge of operations, was still at the office. It was his practice to check the terms of a broker's telex with the trader who made the deal and then send an agreement on an Anschutz standard form directly to the other party. Anderson wrote questions to be taken up with Egan on his copy of the Vernon telex, Exhibit 5, one of which was "how will prod. be loaded and handled—Blenden (sic) on board, ashore?"

On Monday, October 26, Egan telephoned Vernon using a conference phone with Anderson, David Tobin (Anschutz' general counsel) and another employee present. The parties are again in substantial disagreement as to what was said. Anschutz' general counsel, John Tobin, testified that Vernon initially stated that it was his understanding that the cargo was to be discharged, blended ashore and then reloaded. (Tobin 452) But that he would confirm that understanding with Transoil.

Tobin claimed that he stated Anschutz could make a deal because it could "live with" such a blending procedure but there was no meeting of the minds on a two port load. (Tobin 452) As noted supra, Vernon's note to the file, Exhibit AX, contains a different version of the conversation. At trial Vernon testified that in the telephone conference call questions were put to him concerning the proposed blending process which he relayed to Gamboa. Gamboa responded to Vernon that he "would be happy to discuss it (Anschutz) once they opened their letter of credit", the letter of credit being called for by the terms of the agreement embodied in the Vernon telex.

On October 26 Gamboa made arrangements with Lewis of Saybolt, nominating that company to perform the on board blend and issue an inspection report. Next Gamboa purchased the gas oil he believed was needed to achieve the desired blend, approximately 25,000 barrels, plus or minus 20 percent, at Transoil's options. That Monday morning a copy of the Vernon telex was forwarded to Anschutz' London office but it is not clear on whose authority at Anschutz this action was taken.

Although Transoil claimed otherwise prior to the trial, it appears that there was no decrease in the market price for No. 6 fuel oil between Friday, October 23, and Monday, October 26th. Egan testified to his belief that in the interim the price had risen a dollar per ton. Of course, the market softened thereafter (TR 287) so that the price at which Transoil eventually resold the cargo was $9 per ton less than the anticipated price to Anschutz.

Anderson testified that on October 26 he telephoned Saybolt and spoke with the Freeport manager, Robert Lewis. At his deposition Lewis could not recall this conversation. Exhibits reflect two calls from Anschutz to Saybolt on that date. Anderson testified that after being advised of Transoil's blending methods he asked Lewis his opinion of the likelihood of success and that Lewis told him that he would not certify the quality of the material on board the vessel and that he did not believe that the blend would work. (Anderson 412) Since Lewis had no recollection of this conversation, we do not rely on Anderson's testimony for the truth of what Lewis is alleged to have said.

At the close of business on October 26th the blending procedure was still being discussed and Transoil sent Vernon a telex to be forwarded to Anschutz confirming the nomination of the vessel Polysunrise to carry the cargo, requesting information as to discharge points, stating that the blend was to take place at Freeport and asking that Anschutz open the letter of credit required under the agreement. The telex, Exhibit 14, concluded "notice is hereby given that material which is to be blended at Freeport, Bahamas, to satisfy specs sold to Anschutz Petroleum Marketing Corp., will not be prepared until required L/C (letter of credit) is duly opened. In view that our agreement calls for title to pass from Transoil Jersey Limited to Anschutz Corp. at the flange connection at Freeport, any demurrage resulting from Anschutz' failure to comply with the terms of our agreement will be solely for their account.

Anschutz in turn responded with a telex, Exhibit 15, denying that a contract was formed, as set forth in Vernon's confirmation of October 23rd, denying responsibility for demurrage as asserted in the Transoil telex and stating:

"As further discussed we will use our best efforts to reach a mutually satisfactory solution to this situation and enter into a contract reflecting such situation."

On Tuesday, October 27, 1981, discussion continued: Gamboa speaking to Vernon, who relayed the information to Anschutz. Gamboa seeking to allay the concern Anschutz had expressed about the homogeneity of the product to be blended as Transoil proposed offered to change the deal to a "delivered deal" whereby Transoil would guarantee the quantity and quality at the discharge port rather than at the load port if Anschutz would pay Transoil for the potential in transit loss of oil. In "delivered deals" industry practice is for the buyer to pay a 5 percent surcharge to

compensate for the physical loss of product in transit.

Alternatively, Gamboa offered to permit the Polysunrise to stay in Freeport an additional 48 hours, so that the cargo could be recirculated throughout the ship before sailing, on condition that Anschutz pay the consequent demurrage which was at the rate of $12,000 per day. It was also suggested that Anschutz' operation manager, Anderson, could observe the blending and testing in Freeport. By the end of the day on October 27th, Anschutz advised Transoil that it was preparing a response to Transoil's proposals and that Anderson had made arrangements to meet with Gamboa in Freeport.

### Events In Freeport

The Polysunrise arrived in Freeport on the evening of October 26, 1981. Loading of the gas oil was to commence on Wednesday, October 28th, and Gamboa flew to Freeport early that morning, not having heard from Anschutz and not knowing whether an Anschutz representative was coming.

On arrival Gamboa went to the Saybolt office in Freeport where he learned that the No. 6 fuel oil was of a higher viscosity than Vitol had previously reported. Gamboa arranged for the purchase of additional gas oil to adjust for this. A compatibility test was run on a composite sample of the fuel oil on board the Polysunrise which indicated that the cargo had the highest possibility rating, i.e., that it comingled easily. A laboratory hand blend test was done, following which Gamboa discussed the loading and blending procedures with the ship's master and the Saybolt inspector. The master suggested that, contrary to Gamboa's original intentions, the cargo not be circulated immediately after sailing but be circulated at the end of the voyage. Gamboa who testified that he had not received word from Anschutz at that time (and made no effort to contact Anschutz directly) agreed to the master's suggestion and then left for the airport to return to Miami. At 3:45 p.m. on October 28 the Polysunrise commenced loading of gas oil.

In fact, at 10:05 p.m. on October 28, Anschutz had sent a proposed agreement to Transoil offering to buy the fuel oil at the same price and quantity as contained in the October 23rd Vernon telex but provided that quality would be determined in each individual tank of the vessel both at load port and discharge. Anschutz had the option to discharge at two ports and, therefore, to sell portions of the cargo to two different buyers. There was concern that if uniformity were lacking a portion of the cargo might not meet specifications. This concern existed because Transoil did not guarantee the homogeneity of the product (TR 287) and because an on shore blending was more likely to be homogenous than an on board blending (TR 258)

At 1:00 p.m. on October 28, 1981, Anderson arrived at Freeport for the purpose of supervising the blending and testing of the cargo. He tried unsuccessfully to reach Gamboa. Anderson telephoned the hotel at which someone had told him Gamboa was staying and was told Gamboa had checked out. Anderson also tried unsuccessfully to reach Gamboa through Saybolt and the refinery. (Anderson 395)

Gamboa telephoned Anderson between 4:00 and 5:00 p.m. and told him that the vessel was about to sail and that it was too late to do anything further in Freeport. Gamboa and Anderson appear to have had a singularly uninformative conversation. Anderson did not mention the Anschutz telex and Gamboa made no offer except to invite Anderson to come to Transoil's Miami office.

The vessel appears to have completed loading at 7:15 p.m. on October 28th and sailed at 2:15 a.m. on October 29th, according to the Saybolt report, Exhibit 17. Defendant's proposed finding number 42 states these times to be 7:15 p.m. on October 27th and 2:15 a.m. on the 28th, but this appears contrary to the documentation. It was, therefore, physically possible for Gamboa at the time he spoke to Anderson to have delayed the sailing of the Polysunrise. Gamboa had telephoned Anderson from the airport because he had learned

from Transoil's Miami office that Anderson was in Freeport. He testified that he had not learned of the Anschutz counterproposal, nor did he inquire as to this. (TR 283)

We find his testimony that he made no inquiry of his office as to the contents of the Anschutz telex difficult to accept and indeed find it more plausible to conclude that Transoil decided that its best strategy was to break off negotiations with Anschutz and have the vessel sail as soon as possible. There's no question that Gamboa could have delayed the sailing, (TR 28) although, of course, there is the demurrage rate of $12,000 a day which was of concern. Anderson called his New York office and spoke with Tobin and Egan, who told him not to meet with Gamboa in Florida but to return to New York.

### The Saybolt Inspection Report

The Vernon telex, Appendix A hereto, included as one of the terms of the sale the following:

"A single certificate of quantity and quality will be issued after product is loaded at second port, Freeport, Bahamas" ...

Anschutz contends that Transoil never intended to comply with this requirement and that the report actually issued by Saybolt, Exhibit 17, is not the certificate called for by the telex. Anschutz contends that a disclaimer appearing as a legend in the upper right hand corner stating "report of analysis performed and submitted by supplier or consignee" results in the certificate not being an independent Saybolt certificate as called for by the agreement.

Transoil points to the evidence indicating that the notation was always placed on Saybolt reports from Freeport, where Saybolt did not have its own laboratory. The tests were performed, Transoil claims, at the facilities of the Bahamas Oil Refinery Company (BORCO) by BORCO personnel and witnessed by a Saybolt inspector. It was, therefore, an independent Saybolt certificate acceptable to the industry as such.

Charles Dowse, formerly Saybolt's general manager in the Caribbean, testified that if the tests had been witnessed the report would have said so. (Dowse 528)

Robert Lewis, the Saybolt inspector who actually issued the certificate, testified (by telephone deposition with the consent of the parties) that he had no independent recollection of the matter, that the analysis would normally be witnessed by Saybolt personnel. He testified that there was at one time a company policy to disclose the presence of an inspector explicitly on the report—Exhibit 17 contains no such disclosure—but he did not remember if that policy was in effect at the time the report was issued.

The Saybolt certificate is attacked by Anschutz on two further grounds. As to quantity, Anschutz contends that this had to be determined by shore tank measurements (Gamboa 228–229, Vernon 360, Lewis 578–579) and both former Saybolt employees (Dowse at 538 and Lewis at 31) testified that the hullage reports contained in Exhibit 17 do not constitute a Saybolt certificate of quantity.

Transoil counters (plaintiff's proposed finding number 57) that the loaded quantity of the cargo at Freeport "was not a material term of the contract" and was included in the Saybolt report "as a matter of custom and for the sake of completeness."

Most significant, however, in view of the central dispute between parties, is the validity of the Saybolt certificate as to the quality of the cargo after the gas oil was loaded at Freeport. It is Transoil's claim that the Saybolt report, based on an analysis of the No. 6 fuel aboard the Polysunrise, on arrival and the results of a hand blend analysis done prior to loading is an accurate reflection of the quality of the product after the gas oil was loaded, acceptable in the industry as a certificate of quality. Transoil urges that samples taken from the ship immediately after the gas oil is loaded, and before the two products are blended, will not reflect the true quality of the cargo because such samples will not reflect the right portions of gas oil and fuel oil. (Transoil's proposed finding 58.)

Anschutz points to the hypothetical nature of the analysis done, i.e., that the hand blend indicates what the cargo should be like if actually mixed and blended aboard the vessel in the same fashion as done in the laboratory and not the true condition of the cargo actually aboard the vessel when it sailed from Freeport. Dowse, asked if the laboratory hand blend reflected the actual condition of the cargo, replied "not necessarily" (Dowse 524) and Lewis agreed that he was not certifying that the cargo met any specification "before it sailed or that it would meet any specification "before it sailed or that it would meet any specification upon its arrival." (Lewis 45)

This is so because if the master does not cause the gas oil to be added to the individual tanks in proper proportion, or if there is inadequate recirculation or some error in the hand blend analysis is made, the results will not meet expectations.

Transoil Resells the Cargo

On October 29 Transoil sent a telex to Anschutz rejecting the latter's "offer" and stating the specifications derived from the Saybolt report which were within the parameters of the Vernon October 23 telex (The Transoil telex, Exhibit 23) reduced the specifications for viscosity from 3,500 to 3,450 contrary to the Saybolt report. Anschutz contends that this was done to create the appearance of a margin for error which did not, in fact exist. (Transoil also offered to guarantee the quality at the discharge point without additional cost to Anschutz.)

On October 29 Anschutz sent a telex to Transoil withdrawing its October 28th offer. On October 30 Transoil sent a telex to Anschutz stating that unless Anschutz accepted Transoil's proposed amendment to have quality determined at discharge by the close of business on October 30 Transoil would hold Anschutz liable for breach of contract. On October 30 Anschutz' counsel Tobin replied by telex that there was no contract and that Vernon was acting only as Transoil's "broker and agent". On October 30 Vernon telexed stating that he had acted as broker for both parties.

On or about November 13, 1981, Transoil sold the cargo to two purchasers, Tampa Oil Limited and Vitol, at $167 per metric ton, as I have indicated, $9 per ton less than the contemplated price to Anschutz. The terms of this sale called for a quantity and quality determination to be made at Rotterdam by an independent inspector.

During the Transatlantic voyage the blended fuel oil was recirculated through the ship's tanks. At discharge two questions arose which Transoil characterized as minor and which it says was satisfactorily resolved. The first related to the homogeneity and uniformity of the product. Vitol complained to Transoil on December 3 that on examining the product on outturn it found that the product was not homogeneous. Vitol, in fact, blended the product in its own shore tanks. The specifications on outturn for the other parcel exceeded the contract specifications for viscosity but the customer had agreed to be bound by an inspection of the entire ship's composite rather than the particular parcel it had purchased. This possible contingency was precisely the problem that had caused concern to Anschutz during the conversations previously referred to. The second issue which arose related to the custom status of the cargo which was initially denied EEC certification.

Conclusions of Law

To the extent that resolution of this controversy turns on oral testimony as to the events in question, the versions are strongly conflicting. Whether lack of clear recollection, genuine misunderstanding or the passage of time, colored by self interest, accounts for the varying versions is difficult to assess. However, certain reasonably clear circumstances taken together with the key contemporaneous documents, the Vernon October 23 telex and the Saybolt report, enable resolution of this controversy.

The issue to which counsel devoted considerable attention relate to the questions whether as a matter of custom and practice in the industry the broker, here William

Vernon, acts as agent for both parties with the consequence that the confirmatory telex which he sent is a writing subscribed to by both parties, including the party to be charged, and satisfies the statute of frauds. Transoil contends that it does. Anschutz points to its practice of sending its own telex with its own standard provisions and urges that it does not. For the reasons which I will indicate, the court finds it unnecessary to resolve that issue, although I will have some comments as to how that issue should be treated by the industry in the future.

For the purposes of this opinion, however, we assume arguendo that Vernon was, in fact, functioning as an agent for both parties and that were the other requirements of contract formation and breach of contract present that the telex would satisfy the statute of frauds.

■ Anschutz asserts that, apart from all other defenses, there was no "meeting of the minds" or agreement between the parties as to the material terms of a contract on October 23, 1981. We agree.

First, it must be remembered that all discussions on October 23rd were conducted through Vernon, never any direct communication between Egan and Gamboa before a contract was allegedly made. For there to have been a meeting of the minds, it is necessary for the plaintiff to establish that Gamboa made full disclosure of the method of blending to Vernon and that Vernon passed this information on to Egan. The situation is complicated by Vernon's acknowledged lack of familiarity with on board blending and Egan's then recent employment by Anschutz.

Significant discrepancies exist between the testimony of Vernon and Gamboa. For example, as I believe I have noted, Gamboa asserts that he told Vernon of an intent to have an on board blend prior to October 23rd. (Gamboa 119) Vernon denies this and testifies that he was not told about the load at Freeport or the on board blend until later in the October 23rd negotiation, possibly even after the alleged oral agreement had been reached (Vernon 354, 355, 357)

and possibly even after Egan had already left for the weekend.

The method of blending and the documentation of cargo were certainly material terms to the contract. Even were the blending a simple matter of mixing two compatible substances with an absolute assurance of the result of such mixture, Anschutz had a legitimate concern whether the cargo it was purchasing, and for which it had to post a letter of credit and take title in the proposed CIF transaction, would be freely marketable even as the vessel was in transit. Anderson's query on the October 23rd telex, which he received on that date, after Egan had already left, as to the method of blending indicates a concern with this question prior to any discussion with Egan or communication with London and prior to any alleged softening in the market price.

Transoil suggests that Anschutz simply overruled Egan on a deal he had made and, indeed, Transoil seeks to bolster this contention by testimony from its chief executive officer, Eduardo Bent, that at a trade convention and social gathering in October 1981 Bent asked why Anschutz had walked away from the deal and that Egan apologized and said that he was new with the company and was overruled. Egan denied this conversation. In any event, we place little or no weight on this alleged admission made by one confronted at a cocktail party.

But Anschutz appears to the court to have made genuine efforts to meet real concerns—for example, sending Anderson to Freeport—and we do not find that these concerns were pretextual to escape a deal made by a new employee.

Both parties point to the Vernon telex itself as reflecting their version of what transpired. The best that can be said of the telex is that it reflects Vernon's lack of familiarity with on board blending. The telex describes the cargo simply as No. 6 fuel oil and makes no mention of an on board blending, although, since such a procedure is somewhat unusual in the industry, it would be appropriate to note it.

Moreover, the telex makes no reference to the product as being "blended" which would be an unnecessary term if applied to an on shore blend.

Vernon acknowledged that "in retrospect I should have said on board blend." (Vernon 326) Bent also testified that he usually discloses that the product is an on board blend although he doesn't believe it is necessary to do so. (Bent 77) Paragraph 6 of the telex provides for a single certificate of quantity and quality after the product is loaded at the second port. As we discuss later, such a proviso is more suggestive of a shore tank blending than an on board blend.

Further to this point, paragraph 10 provides that title will pass, and with it of course risk of loss, "at the time the oil passes the flange connection between the shore facility and the vessel at the second load port, Freeport, Bahamas."

If there is a shore tank blending, all of the cargo, in fact, passes through the flange at the second load port. If there is an on board blending, the cargo loaded at the first load port never passes the flange at the second load port.

This provision alone would make understandable Anschutz' doubts as to the blending procedure contemplated by Transoil and as reflected by the Vernon telex. Transoil points to the provision in paragraph 12 for EEC customs exemption applicable only if the cargo is regarded as coming from a third-world country (i.e., Mexico) rather than an EUR–1 which would apply to a cargo originating solely from the Bahamas and to Vernon's post dispute note to the file and oral testimony as indicating that the parties in fact had a meeting of the minds. Gamboa testified that if an on shore blending was contemplated there would be no reference to two ports.

But on balance, although the issue is not free from doubt, we find Gamboa's testimony less than candid and trustworthy and Vernon's testimony to be inconsistent, equivocal and to a considerable extent reflecting his contemporaneous lack of familiarity with the blending procedures contemplated by Transoil. We conclude that Transoil has not sustained its burden of proving that there was a meeting of the minds on October 23rd as to material terms of the contract, i.e., the nature of the product being sold, its quality and documentation.

■ Closely related to this issue is the question whether Transoil was ready, willing and able to perform the obligations which it alleges were incurred by virtue of the October 23 telex. We find that it was not.

Under the terms of the Vernon telex the contract was to be CIF. Anschutz was entitled at the time that it was to have proffered the letter of credit and assumed title to be assured that the cargo met specifications—not that it was in the process of being prepared to meet specifications.

Thus, Gamboa testified "it is generally not the concern of the buyer to discuss how it's going to be done (i.e., the blending performed) because he's not buying the cargo until the quality is met." (Gamboa 137) Under the Vernon telex terms, Anschutz had the right to designate two discharge points thus permitting Anschutz to sell the cargo to two different purchasers at the two different ports. Anschutz had a concern that, although the hand blend indicated what the overall viscosity of the cargo would be, individual tanks of the vessel would not meet contract specification either because there had been some inaccuracy in the loading of the gas oil, the hand blend test, or because of inadequate circulation of the oil. The amount of gas oil to be added by Transoil allowed no margin for error, i.e., it was intended to meet but not exceed the contract specifications.

Plaintiff's rebuttal expert, Mr. Lewis, testified if you do not allow some margin "you are asking for trouble." This risk, the risk of failure to meet specifications because of one of the circumstances noted above, the seller was to bear and it could not require the buyer to acquire title or to post a letter of credit at an earlier time. Anschutz had the right to know before it posted its funds that any portion of the

cargo sold to a third-party would meet the requisite specifications which were those established for Grade C European bunker fuel.

A further test, a ship's composite after reloading and blending, taken from various levels of the ship's tanks would disclose the quality of the blended product. The only ship's composite in the Saybolt report is of the cargo loaded in Mexico. No ship's composite was done in Freeport after the gas oil was loaded because it takes approximately two days for the gas oil to rise through the No. 6 oil and unless this occurs the product is not blended and would not meet the specifications.

Moreover, Anschutz had the right to be assured that it would have documentation which would enable it to sell all or a part of the cargo while the vessel was in transit on the strength of a single independent certificate that the cargo on board met the requisite specification. When Gamboa, knowing that Anderson was in Freeport to inspect the loading procedures and testing permitted the Polysunrise to sail without more, he took a risk. Rather than incur the possible expense of a few day's demurrage and that Anschutz might not, in any event, accept the cargo he permitted her to sail while possible reconciliation of the parties' positions were still under discussion.

We hold that Transoil was not ready, willing and able to perform its material obligations under the agreement because it could not furnish the single certificate of quality called for by the October 23rd telex.

Of course, Anschutz' alleged repudiation, while excusing a formal tender, does not as Transoil itself acknowledges, relieve Transoil of the obligation to demonstrate that it was ready, willing and able to perform.

These conclusions render it unnecessary for us to resolve the issue upon which, as I have already noted, the parties placed considerable emphasis during this litigation, that is, whether under the custom and usage of the spot oil trading market the broker acts as an agent for both buyer and seller with the consequence that the confirmatory telex which is sent by the broker after oral negotiations have led to an agreement was a writing subscribed by the party to be charged which satisfies the statute of frauds and the UCC Section 2–201.

We decline to opine on this question recognizing its importance to the industry and that whatever we say on the question in this suit would be dictum, since we have concluded that in any event no contract was formed, because there was no meeting of the minds, and that even if a contract was formed Transoil has not demonstrated that it was ready, willing and able to perform in accordance with the alleged terms of that contract. Until the issue is definitively resolved in a suit in which its resolution is crucial to the merits of the case (perhaps with the benefit of amicus briefs from industry associations) we would recommend—if the oil spot trading industry would permit a gratuitous suggestion—that traders make explicit at the outset of negotiations with a broker the broker's authority and insure that any limitation on such authority is communicated to the other party to the negotiations. The issue is one which should perhaps also be addressed by any appropriate industry trade association independently of any pending litigation.

For the reasons stated above, judgment will enter for the defendant dismissing the complaint. So ordered.

APPENDIX A

6161
WU INFOMASTER

VPI MFRD

028071A296 1804EST

148865
VPI MFRD

APMA NYK
OCTOBER 23, 1981

TO: ANSCHUTZ PETROLEUM MARKETING CORPORATION
666 FIFTH AVENUE
NEW YORK, NY 10019
ATTN: MR. ED EGAN

CC: TRANSOIL (JERSEY) LTD.
ST. HELIER
MADRID, SPAIN
ATTN: MR. ED BENT

CC: TRANSOIL BROKERAGE
345 PALERMO
CORAL GABLES, FLORIDA
ATTN: MR. CARLOS GAMBOA

THIS IS TO CONFIRM THAT TRANSOIL (JERSEY) LTD. (HEREINAFTER CALLED SELLER) HAS SOLD NO. 6 FUEL OIL TO ANSCHUTZ PETROLEUM MARKETING CORPORATION (HEREINAFTER CALLED BUYER) UNDER THE FOLLOWING TERMS AND CONDITIONS:

1. PRODUCT: NO. 6 FUEL OIL

2. PRICE: USD 176 PER METRIC TON C.I.F. ROTTERDAM

3. QUANTITY: 50,000 METRIC TONS PLUS OR MINUS 10 PERCENT SELLER'S OPTION

4. QUALITY: PRODUCT WILL MEET THE FOLLOWING SPECIFICATIONS:

|  | MIN | MAX | TYPICAL |
|---|---|---|---|
| API GRAVITY AT 60 DEGS F | 11 | 20 | 14 |
| VISCOSITY REDWOOD 1 AT 100 DEGS F |  | 3500 |  |
| FLASH POINT DEGS F | 150 |  |  |
| POUR POINT DEGS F |  | 60 |  |
| SULPHUR, WT. PCT. |  | 3.5 | 3.0 |
| BS&W PCT. |  | 1.0 |  |
| VANADIUM PPM |  | 300 | 235 |

5. METHOD AND PLACE OF DELIVERY: DELIVERED VIA SELLER'S VESSEL–POLY SUNRISE–C.I.F. ROTTERDAM. VESSEL CHARTERED WITH OPTIONS FOR DELIVERY TO SCANDANAVIA INCLUDING DENMARK WITHIN I.W.L. LIMITATIONS, GIBRALTER/HAMBURG RANGE FOR NWE AND EUROMED EXCLUDING LEBANON, ISRAEL, TURKEY AND SYRIA. BUYER HAS TWO PORT DISCHARGE OPTION AND FREIGHT FOR DELIVERY TO PORTS OTHER THAN ROTTERDAM WILL BE CALCULATED ON THE BASIS OF WORLDSCALE 65 WITH LOADPORT FREEPORT, BAHAMAS USED FOR THESE CALCULATIONS.

6. INSPECTION: THE QUALITY AND QUANTITY OF THIS PRODUCT WILL BE DETERMINED BY INDEPENDENT PETROLEUM INSPECTORS BASED UPON PRODUCT LOADED AT PAJARITOS, MEXICO AND FREEPORT, BAHAMAS. A SINGLE CERTIFICATE OF QUANTITY AND QUALITY WILL BE ISSUED AFTER PRODUCT IS LOADED AT SECOND PORT, FREEPORT, BAHAMAS AND THIS DOCUMENT SHALL BE CONSIDERED FINAL AND BINDING BY BOTH BUYER AND SELLER. SAYBOLT TO INSPECT FOR QUANTITY AND QUALITY AND COSTS WILL BE SHARED EQUALLY BETWEEN BUYER AND SELLER.

7. DELIVERY PERIOD: NOVEMBER 10/25, 1981 C.I.F. ROTTERDAM.

8. PAYMENT: IN U.S. DOLLARS PROMPTLY UPON PRESENTATION OF INVOICE AND DOCUMENTS AGAINST AN IRREVOCABLE OR STANDBY LETTER OF CREDIT OPENED WITH A FIRST CLASS BANK ACCEPTABLE TO SELLER AND THEIR BANK PARIBAS, GENEVA. IN THE EVENT DOCUMENTS ARE UNAVAILABLE WITHIN 15 DAYS FROM PAJARITOS, MEXICO B/LADING DATE PAYMENT WILL BE MADE UPON BASIS OF SELLER'S LETTER OF INDEMNITY FOR DOCUMENTS.

9. DEMURRAGE: LAYTIME ALLOWED WILL BE 36 HOURS PLUS 6 HOURS NOTICE OF READINESS SHINC. DEMURRAGE, IF INCURRED, WILL BE AT WORLDSCALE 65 BASED UPON FREEPORT SINGLE LOADPORT.

10. TITLE AND RISK OF LOSS: TITLE AND RISK OF LOSS WILL PASS FROM THE SELLER TO BUYER AT THE TIME THE OIL PASSES THE FLANGE CONNECTION BETWEEN THE SHORE FACILITY AND THE VESSEL AT THE SECOND LOADPORT, FREEPORT, BAHAMAS.

11. MEASUREMENT: SHORE TANK MEASUREMENTS AT LOADING INSTAL-LATIONS WILL APPLY FOR DETERMINING VOLUME WHICH WILL BE CONVERTED AT 60 DEGREES F.

12. EEC: SELLER WILL SUPPLY A-1 CERTIFICATE WHICH WILL QUALIFY PRODUCT FOR EXEMPTION OF EEC DUTY. IN THE EVENT THAT THIS DOCUMENT PROVES UNACCEPTABLE TO OBTAIN THE DUTY EXEMP-TION, SELLER WILL BE RESPONSIBLE TO REIMBURSE BUYER FOR THESE DUTIES IF INCURRED.

13. OTHER TERMS: ALL OTHER TERMS TO BE IN ACCORDANCE WITH INCO TERMS 1980 PLUS AMENDMENTS AND ACCORDING TO ENGLISH LAW WITH ARBITRATION LONDON UNDER ICC RULES.

THANK YOU FOR THE OPPORTUNITY OF SERVING YOU AS BROKERS.

BEST REGARDS
BILL VERNON
V.P.I.
TLX. 643657

VPI MFRD